## Case No. 16,033.

### UNITED STATES v. PEREZ.

[2 Wheeler, Crim. Cas. 96.]

Circuit Court, S. D. New York.    Sept., 1823.

CRIMINAL LAW—DISCHARGE OF JURY FOR INABILITY TO AGREE—DISCRETION OF COURT.

[The jury having been discharged after being out only about four hours, and reporting that they were equally divided, and could not agree, the court was divided on the question whether the discharge was justifiable under the circumstances; Van Ness, Circuit Judge, being of opinion that the discharge was too soon, and Thompson, Circuit Justice, holding that the matter was in the sound discretion of the court under all the circumstances, and that it was not necessary that the jury should be so far exhausted as to be incapable of any further deliberation, or should be disabled by sickness or intoxication.]

[This was an indictment against Joseph Perez for piracy.]

In calling the jury the panel was exhausted and Dr. Roosa was selected as a talesman. He was objected to by the counsel for the prisoner, that he was a physician. The court overruled the objection, and a peremptory challenge was made. It was permitted by the court that the counsel for the prisoner might interrogate the jurors as they came to the book to be sworn, "whether they had expressed an opinion against the prisoner," and they were so interrogated. Captain Edward Johnson testified, that he was a citizen of the United States, sole owner of the schooner Bee, and principal owner of her cargo. He sailed with her from Charleston, S. C., on the 20th of July, 1822, on a voyage to St. Juan de Remedios, in the island of Cuba. The vessel was of about 50 tons, and the cargo consisted of flour, rice, butter, lard, codfish, tinware, watches, &c. On the 14th of August, being then about a mile and a half from the coast of Cuba, and not far from the place of destination, saw a small schooner of about 30 tons coming out from under the land. She was Baltimore built, schooner rigged, apparently about 30 tons burthen, without a topsail, and hoisted Buenos Ayrean colors. She hailed the Bee, on which the anchor was let go; and a boat sent from the Bee on board of her. When the boat returned, witness was forward stooping down, and paying out the cable. His first notice that the pirates were on board was their cutlasses, with which they

began beating him with great violence. He had with him on board the Bee a sailing-master, whose name was Manuel Fernandez, a Portuguese, who spoke Spanish, James Deban, Joseph Porter, James Thompson, and a Portuguese passenger, who was taken in at Charleston, who spoke no English, and whose name the witness never knew. Fernandez interceded with the pirates, upon which they desisted from beating the witness. They then put a six-pounder, which was on board the Bee, into the boat, together with colors, trumpets, and other tight articles, and got the Bee under weigh, again running until within half a mile of land, when they brought her to anchor, and laid the piratical schooner on the larboard side, close to her. At this time there were about twenty of them on board. They took off the tarpaulin, and one of them, who, according to the best of witness' knowledge and belief, was Joseph Perez, the prisoner, took a crow-bar and drove it in once or twice into the hatch. They called for the axe of the cook, but before anything was further done, witness was hurried on board the piratical schooner to assist in throwing out the ballast, for the purpose of lighting her so as to receive the cargo of the Bee. The witness then stated various acts of wantonness and cruelty during eight days, that were inflicted on them by the pirates; the manner in which they sold off the greater part of the cargo to the people who flocked down from the country to purchase, and the arrival of a British schooner from New Providence to whom the residue of the cargo was sold.

On the 22nd of August, having disposed of all the cargo, the pirates got both schooners under weigh, and beat out to the entrance of the Keys, five or six miles from the main land, when witness was told by the carpenter that they were about to run the Bee ashore. This was soon after done, after taking two or three stretches upon West Salt Key. A small boat like a canoe was brought alongside, with one sail, and one oar and a half, some beef and water. They then ordered witness into the boat. He went in. They then ordered him out again, and he came out. On this the prisoner, Perez, came up to him, and ordered him to take down his small clothes. Prisoner then examined the waistband and lining, searched witness' person for belts, and ripped open the lining of his hat and shoes, searching for money. Shortly afterwards the prisoner came up from below, and brought up a gold piece in his hand. He held it up towards witness' face, and said, "Dis for you," meaning, as witness supposed, have you any more like this on board? Witness answered him, "No gold in America;" when the prize master, who could speak English, said, "No, no—no gold in America." Witness was now standing by the gunwale, when, turning round, he saw the prisoner take a long knife from his

side, and cut the standing part of the fore-peak haulyards, for the purpose, as witness then thought, and still believes, of hanging the cook therewith. Prisoner called the cook, and made a grasp at him, when the prize master called out, "No, no!" and then he desisted. They ordered witness, the passenger, and all the crew, except Deban, into the boat. There were five in the boat. Capt. Fernandez said they must not stand in shore, or the pirates would kill them all. They accordingly continued to stand out, till they ran down the hull of the piratical schooner. They soon after saw the Bee in a blaze. They then made for the land, (as the boat leaked exceedingly, and had to be bailed constantly by two men,) and got into the mouth of a creek near Matanzas, after being about four days at sea, and landed at Matanzas on the 27th, in the evening.

These facts being proved to the court and jury, no doubt existed that they amounted to piracy. Witnesses, however, were introduced who testified to facts that left some doubt whether the prisoner was the same person who committed the piracy upon Captain Johnson.

The case was summed up to the jury by Messrs. Nevins & Hoffman, for the prisoner, and by Messrs. Haines & Tillotson, for the United States.

THE COURT charged the jury about eight o'clock in the evening. They retired to consider upon their verdict, and returned into court before ten the same evening, when some points of law were explained, to them, and they were again sent out, and about twelve o'clock they were discharged; they having previously informed the court that they were equally divided, and that there was no prospect of their ever agreeing upon their verdict.

A motion was made to discharge the prisoner, by his counsel, on the ground that the court had no authority to discharge the jury but in extreme cases, and that this was not such a case.

The court were divided. VAN NESS was of opinion the jury were discharged too soon. THOMPSON, Circuit Justice, decided upon the motion, that there need not be a physical impossibility to a unity of opinion. He decided, the court had power to discharge the jury in criminal cases, and that it rested in the sound discretion of the court, under all the circumstances of the case; that it was not necessary the jury should be so far exhausted as to be incapable of further discussion and deliberation, nor was it necessary that they should be disabled by sickness, intoxication, or mental derangement. It was enough that they could not agree; that there was a moral disability. In this case the jury had been out near four hours; a length of time amply sufficient to agree upon their verdict, if they could. This was a plain question of fact for them to decide. There were no intricate questions of law in

the case. A longer time ought to be afforded to the jury where a case involved a great number of facts and points of law. It depended more upon the nature of the case than upon any settled rule that could be laid down for the discharge of the jury. If the jury could not make up their minds and agree upon their verdict in four hours, where the identity of the prisoner was the only question before them, it was probable they never could agree.

As the court were divided, no judgment was given.

[NOTE. Upon a certificate of a division in the opinions of the judges the cause was taken to the supreme court, which decided that the prisoner was not entitled to be discharged from custody and might again be put on trial. 9 Wheat. (22 U. S.) 579.]